(No. 4424— ▮▮▮▮▮)

SYLVIA THOESEN, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 13, 1951.*

J. MICHAEL MADDA AND ABRAHAM B. LITOW, Attorneys for Claimant.

IVAN A. ELLIOTT, Attorney General; WILLIAM H. SUMPTER, Assistant Attorney General, for Respondent.

LANSDEN, J.

This is a case under the Workmen's Compensation Act. Commissioner Egill Anderson, one of the

Commissioners of this Court, heard this case, and his report, filed herein, reads in part as follows:

"Claimant, Sylvia Thoesen, a spinster, 50 years of age, height 5 ft. 4½ inches, and weighing 225 pounds, was on December 6, 1950, at 12:30 P.M., employed by respondent as field auditor in the Department of Revenue. While in the course of her employment, and walking down a set of stairs leading to the vault located west of the south bank of elevators at 11 South LaSalle Street, Chicago, claimant fell down six or seven treads to the landing below, landing on her knees, and injuring her legs, bruising her shoulders, back, hips and nose. After the fall claimant rested a while on the landing, and then went downstairs to the vault where she sat for about two or two and one-half hours, and then took a cab home. When she arrived home she fainted several times, and went to bed. A Dr. Richter called on claimant the next day, examined her, and prescribed a sedative that evening, and cold applications to the legs. He called on her again the following day, but prescribed no medicine, and suggested to her that when she felt better she should have X-Rays taken. He called on her the third time around Christmas, gave no treatment, but prescribed some medication. She stayed in bed for seven days, and was off from work from December 6, 1950 to January 2, 1951.

After seven days thrombosis appeared in the inner part of the left leg just above the ankle and outer part of the right leg near ankle. First there was a hard lump, which gradually became painful, and black and blue. This condition of the legs persisted for about three or four weeks in the left leg, and about two weeks in the right leg, when it finally cleared up satisfactorily.

Claimant kept hot compresses on her legs, and took some medication for the pain in the ankles while she was staying at home. After she returned to work, she saw Dr. Richter, at which time he took X-Rays of her ankles at St. Ann's Hospital. Claimant also consulted a Dr. DiCosola, who gave her some medication, pills and a prescription, and recommended heat applications to the ankles.

At the time of the hearing, claimant complained of pain in the ankles and knees while working, and also sometimes at night in bed. She testified that her ankles were swollen; that when she went up and down steps she had to hold onto the railing; that she could not walk the way she used to walk; that these conditions did not exist prior to the accident, and that she never was injured before.

Dr. Samuel Weiner testified in behalf of claimant that on August 20, 1951 he gave her a general physical examination, and also an orthopedic and vascular examination. He testified that her lower extremities showed varicose veins in both legs, palpable thrombosis or clots in the pits of the knees, involving the adjacent portions of the calves of both legs, and both of the ankles showed palpable landmarks, which were found to be resistant to motion on manipulation of both ankles.

Claimant's exhibit No. 1, an X-Ray, was received in evidence. This film was taken August 20, 1951, and showed claimant's right and left legs, and portions of both feet. Dr. Weiner, interpreting this film, testified that the right ankle had an inversion deformity; that it is comparatively turned in to the extent of about 15 degrees in the ankle joint, and that it also showed a linear calcification along the tissues adjacent to the

distal end of the fibula in the ankle joint of the right side; also that the right ankle, looking down into the foot, contained some arthritic spur formation between the first cuneiform bone. Dr. Weiner further testified that from his diagnosis, claimant has residual defective circulation of the right leg and ankle, causing a postural disturbance of the ankle and leg; and also a postural thrombophlebitis involvement of the varicose veins of both the right and left leg. He explained that a postural disturbance in the right lower extremity is the inversion deformity of the ankle, which causes a deflection of the weight-bearing axis of the left leg in relation to the ankle, and the only things found there were the residual clots in the veins above the calf and just below the knee. In answer to a hypothetical question incorporating the facts pertaining to claimant herein, Dr. Weiner further testified that there could have been, or might have been, a causal connection between the ill being of the hypothetical person and the alleged accident. He also further testified that the condition of both of claimant's lower extremities was permanent.

Dr. Albert G. Field, expert medical witness for respondent, testified he took two X-Ray films of claimant on September 5, 1951, and same were admitted into evidence as respondent's exhibits Nos. 2 and 3. Dr. Field interpreted respondent's exhibit No. 2 as being an anterior-posterior and lateral view. He stated that there were two projections taken on the same film of claimant's right leg, which disclosed the lower end of the tibia, fibula, and ankle joint. It included the astragalus, the tarsal, and part of the metatarsal bones. He further testified that there was no evidence of bony injury or dislocations; that the anterior-posterior view

disclosed some evidence of sclerosis, and some evidence of osteomyelitis or arteriosclerosis in the blood vessels; that there was no deformity in the site of the ankle joint. He further stated that the ankle joint was well preserved, and the contour of the joint made with the tibia, the astragalus, and the fibula was within normal limits; that there was no break in the continuity; that . there was no pronation or supination, inversion or eversion in the ankle joint; that the ankle was straight; that there was no division in the lateral view on the left; that the front showed no evidence of bony injury or dislocation; and that there was some slight haziness due to some arthritic condition of the ankle joint.

Dr. Field further testified in interpreting respondent's exhibit No. 3 that there were two projections taken on the same film, the anterior-posterior and lateral views of the left leg, which showed the same amount of bone as the previous film; that the X-Ray showed no evidence of bony injury or dislocation in the ankle joint; that there was no break in the continuity; and that it showed some sclerotic condition of the blood vessels due to the arteriosclerosis condition; that in comparing both films they are identically the same; and that there is no appreciable pronation or supination.

Dr. Field, in interpreting claimant's exhibit No. 1, testified it disclosed no evidence of bony injury or dislocation; that the position of the left leg was within normal limits; that there was some sclerosis along the edges of the soft tissues, due to arteriosclerosis in the blood vessels; that the right leg disclosed some deformity to the ankle joint, which was due to the position the patient's foot was held in at the time of the taking of the film; and that the foot was not straightened out in the same way as the foot on the opposite leg.

Dr. Field further testified he made a physical examination of claimant's lower extremities, and stated that she was overweight; that she walked with a flat-footed gait; that he made comparative measurements; that the fossae on each side were well preserved; that the anatomical landmarks were well preserved; that there was some slight crepitation present on manipulation, flexion was within normal limits, and the leg could be fully extended; that the right foot was somewhat rigid, was markedly pronated, and there was a reflection of both the longitudinal and the transverse arches with hyperextension of the toes with prominent metatarsal heads; that the fossae between the metatarsals were fairly well preserved, with no appreciable swelling; that there was some slight spiderweb condition of the veins in and around the ankle joint, but it was small and non-symptomatic; that the movements of the ankle both actively and passively were well performed, and there was no complaint of rigidity encountered on manipulation; and that there was no enlargement of the veins in either leg.

Dr. Field further testified that the movements of her left lower extremities were fairly well performed; that extension was within normal limits; that there was some slight crepitation present in the muscular part of the leg, which was well preserved; that there was no irregularity or no hardening that could be palpated or outlined in the course of the veins, and there was no swelling or deformity whatsoever in the calves of either the right or left leg. The movements of the left foot were within normal limits—flexion, extension, pronation and supination; that she was wearing arch supports made by Scholls' Laboratory, which were not sufficient

for her feet to remain in normal position, and she had some trouble with her arch supports.

Dr. Field in answer to a hypothetical question, incorporating the facts pertaining to the claimant herein, testified that there was no causal connection between the complaint as enumerated at the hearing, and the injuries as described in the hypothetical question. He further testified that the pronation in claimant's feet had existed for a long time, and she was wearing arch supports to give her adequate support, and the swelling and the puffiness around the ankle joints was due to stress and strain placed on the ankle joints because of her overweight, and he concluded by stating that the deformity in claimant's right ankle was due to pronation of the foot as a result of being flatfooted.

Claimant and respondent at the time of the accident were operating under and subject to the provisions of the Workmen's Compensation Act, and notice of the accident was given the respondent within thirty days, as provided by the said Act. At the time and place of said injury claimant was performing duties for respondent in the course of her employment.

During the period from December 6, 1950 to January 2, 1951, while claimant was off from her work, she was paid her full salary. Claimant resumed her employment with respondent on January 2, 1951, and is now so employed.

For the year immediately preceding the injury claimant, while employed by respondent, earned a salary of $2,676.00.

It is the opinion of the undersigned, after hearing the evidence in this case, and observing the movements of claimant, that she has not proved her case by the preponderance or greater weight of the evidence; that

she has apparently recovered from the effects of the fall in question; that the present condition of her ankles appears to be due to overweight; and that the deformity in the right ankle appears to be due to pronation of the foot as a result of claimant being flat footed, and not due to the accident in question."

We do hereby adopt the statement of facts made by Commissioner Anderson, and agree with his conclusions, and an award to claimant, Sylvia Thoesen, will be denied.

Respondent has paid for all medical expenses in this case except a bill in the amount of $45.00 owed Dr. Albert C. Field. An award is entered in favor of Dr. Albert C. Field, Chicago, Illinois, for $45.00.

William J. Cleary & Co., Court Reporters, Chicago, Illinois, was employed to take and transcribe the testimony at the hearing before Commissioner Anderson. Charges in the amount of $82.00 were incurred. An award is entered in favor of William J. Cleary & Co. for $82.00.

An award to claimant, Sylvia Thoesen, is denied.

These awards are subject to the approval of the Governor. Ill. Rev. Stat., 1949, Chap. 127, Sec. 180.